## S13A1219. ENSLEY v. THE STATE.
(751 SE2d 396)

HINES, Presiding Justice.

Grant Murphy Ensley ("Ensley") appeals from his convictions and sentences for the malice murder of his father, Lynn Edward Ensley ("Lynn"), possession of a firearm during the commission of felonies, and the unlawful handling of an explosive device. For the reasons that follow, we affirm in part, vacate in part, and remand for resentencing.[1]

---

[1] Lynn was killed on October 5, 2009. On November 10, 2009, a Fannin County grand jury indicted Ensley for malice murder, felony murder while in the commission of aggravated assault, aggravated assault, possession of a firearm during the commission of the crime of malice murder, possession of a firearm during the commission of the crime of aggravated assault, and the unlawful handling of an explosive device. Ensley was tried before a jury May 16-23, 2011, and found guilty of all charges. On May 28, 2011, Ensley was sentenced to life in prison for malice murder, consecutive terms of five years probation for each of the two charges of possession of a firearm during the commission of a crime, and three years in prison for the unlawful handling of an explosive device, to be served concurrently with the sentence for malice murder; the remaining charges were either vacated by operation of law or merged with a crime for which a sentence was entered. See *Malcolm v. State*, 263 Ga. 369, 371-374 (4), (5) (434 SE2d 479) (1993). Ensley moved for a new trial on June 9, 2011, and amended the motion on September 20, 2011; the motion, as amended, was denied on October 22, 2012. On October 29, 2012, Ensley filed a notice of appeal; the appeal was docketed in this Court for the April 2013 term and submitted for decision on the briefs.

Construed to support the verdicts, the evidence showed that Ensley lived with Lynn, a real estate developer, in Lynn's house. At 11:18 a.m. on October 5, 2009, Ensley called 911 and said that his father had either fallen and hit his head, or had suffered a gunshot wound. Before assistance arrived, Ensley, while still on the 911 call, said that he opened a revolver he found under his father's hand and that two shots had been fired; he also said that he had tried to stop his father's bleeding. When law enforcement and medical responders arrived, they found Lynn on his bedroom floor, lying partially over a space heater; a .38 revolver and two cartridges were on the bed. As law enforcement personnel secured the house, a pipe bomb was found in Ensley's bedroom.

While at the house, Ensley told an investigating officer that he had been on the telephone with his girlfriend and heard two gunshots inside the house, took a handgun of his own, went to investigate, and found his father lying in his bedroom, face down over a space heater. He also said that Lynn was 2.3 million dollars in debt, and feared that there was "a hit man after him." After this interview, Ensley was arrested for possession of an explosive device.

While in custody, Ensley told an investigator that he had "above top secret and classified information that could get him killed," to wit, that he caught a glimpse of someone leaving the house at the time of the shooting who looked like his cousin, Dakota Ballew; Ensley had previously said he saw no one else in the house when Lynn was shot. During a later interview, Ensley recanted his statement that he saw someone. He also told an investigator that the pipe bomb was to be used to blow up a beaver dam, although it contained shrapnel that would not be suited for that purpose. Ensley also revealed that he and Lynn had argued the morning of the shooting over his use of a truck; he also stated that he suffered from post-traumatic stress disorder due to the emotional and physical stress his mother suffered at Lynn's hands when Ensley was younger.

Ensley's girlfriend testified that she was on the telephone with him for 30 minutes before he placed the 911 call, but she put him on hold for eight minutes to take a call from her mother; shortly after she resumed her call with Ensley, he said he heard a gunshot, or gunshots, inside the house, and she then heard a loud noise. Ensley terminated the call, and evidence showed that he placed the 911 call two minutes later.

While in custody before trial, Ensley told two inmates that he had colluded with Ballew to kill Lynn, and that Ballew shot Lynn in the back of the head after they made Lynn get on his knees. Ensley gave a different version to another inmate, saying that he shot Lynn, but that he told investigating law enforcement officers that he saw a

blond-headed person running from the house, and that Ballew is blond. Ballew testified that a year or two before Lynn was killed, Ensley offered to split the proceeds of a life insurance policy with him if he would help Ensley give Lynn an injection of insulin in a fatal amount.

Physical evidence indicated that the fatal gunshot was fired from a distance of two-and-a-half feet or more. The projectile struck near the top of the right side of Lynn's skull and traveled in a slightly downward and forward direction; an expert opined that it was not typical of a suicidal wound. Gunshot residue was found on Lynn's hands, and a projectile had been fired into a mattress in his bedroom.

1. The evidence authorized the jury to find Ensley guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). However, Ensley was sentenced for both possession of a firearm during the commission of the crime of malice murder, and possession of a firearm during the commission of the crime of aggravated assault. We need not consider whether the two underlying felonies merged as a matter of fact, see *Slaughter v. State*, 292 Ga. 573, 575 (1) (740 SE2d 119) (2013); this Court has determined that when two such possession charges involve the same victim, only one sentence for possession is authorized. *State v. Marlowe*, 277 Ga. 383, 386 (2) (c) (589 SE2d 69) (2003). Accordingly, we must vacate those two sentences and remand the case for resentencing. See *Billings v. State*, 293 Ga. 99, 102 (1) (b) (745 SE2d 583) (2013).

2. After the presentation of evidence began, a cousin of one of the jurors told the court that she had visited the home of her juror cousin the previous evening and overheard a portion of a telephone call in which the juror told an unknown person "yes, there's 24 to 26 witnesses"; the cousin did not hear anything else and did not ask the juror anything about the case. She also testified that, three months after Lynn was killed, but before trial had begun, she and the juror discussed the case and the juror said that it was his belief that Ensley "done it" and that Lynn had not committed suicide. The cousin further testified that Ensley was "like a son to her," was the best friend of her own son, and she wanted to ensure that he received a fair trial.

The juror testified that he had spoken by telephone with his employer the previous evening to inform him that he was on jury duty, but had not said anything regarding the number of witnesses. He also testified that he had not had any conversation with his cousin regarding Ensley's guilt, although he was aware that Ensley and his cousin's son were friends; the juror had also heard his wife and his cousin talking about the case. The juror also testified that he had no bias toward either the defendant or the State, that he could be fair

and impartial, and could decide the case based upon the evidence and the court's instructions.

Although Ensley now asserts that the juror should have been dismissed from service and an alternate substituted, see OCGA § 15-12-172, at no time did he make such a request on the record, or request any other remedial action from the court at the time, and he has thus waived appellate review of the alleged impropriety. See *White v. State*, 281 Ga. 276, 280-281 (5) (637 SE2d 645) (2006). In any event, the trial court is vested with discretion to discharge a juror under OCGA § 15-12-172, see *Brooks v. State*, 281 Ga. 14, 18 (3) (635 SE2d 723) (2006), and no abuse of that discretion is shown.

> A trial judge is uniquely positioned to evaluate whether a . . . juror can render an impartial verdict, considering that the trial judge, unlike appellate judges, can observe a prospective juror in person and take account of [his] demeanor and countenance, not just the words that [he] speaks.

*Sears v. State*, 292 Ga. 64, 66 (2) (734 SE2d 345) (2012) (Citation and punctuation omitted.)

3. Ensley contends that his trial counsel failed to provide effective representation. In order to prevail on this claim, he must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984). To meet the first prong of the required test, he must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case. Id. at 784. To meet the second prong of the test, he must show that there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different. Id. at 783. " 'We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

A major component of Ensley's defense was that, comparing the time he called 911, and the time he was speaking to his girlfriend on his cell phone, as well as the fact that he placed text messages to friends while his girlfriend had him on hold, there was insufficient time to commit the murder. After the close of the evidence, but before

closing arguments, one of Ensley's two trial attorneys told the court that he had examined the discovery evidence provided by the State, as well as the stipulated phone records, and realized that the content of the text messages that Ensley sent to two friends while he was on hold with his girlfriend was not in the record. Counsel requested that the court reopen the evidence to allow him to call the two friends to testify as to the content of the messages. During the ensuing discussion, the State noted that the text messages appeared on the admitted cell phone records, and that the recipients were listed in the discovery materials that had been provided. Defense counsel then stated that he would have "no problem" if he was able to discuss the time line of the cell phone calls and text messages during his argument; this was agreed to, and counsel argued this to the jury.

Ensley now asserts that his motion for new trial should have been granted because trial counsel failed to interview the two text recipients before trial, and should have called them to testify at trial. However, assuming that counsel's performance was deficient, Ensley cannot show prejudice resulting from this performance; the witnesses did not testify during the hearing on the motion for new trial, and Ensley failed to establish what trial testimony they would have given that would have aided his defense. See *Reaves v. State*, 292 Ga. 545, 550 (4) (739 SE2d 368) (2013).

*Judgments affirmed in part and vacated in part, and case remanded for resentencing. All the Justices concur.*

DECIDED NOVEMBER 18, 2013.

*Lora M. Alsher*, for appellant.

*B. Alison Sosebee, District Attorney, Rita B. Lewis, Assistant District Attorney, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Jason C. Fisher, Assistant Attorney General,* for appellee.